**Slip Op. 13-118**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| THE STANLEY WORKS (LANGFANG) FASTENING SYSTEMS CO., LTD. and THE STANLEY WORKS/STANLEY FASTENING SYSTEMS, LP, | : : : | |
| *Plaintiffs*, | : | |
| v. | : | |
| UNITED STATES, | : | |
| *Defendant*, | : | |
| and | : | |
| MID CONTINENT NAIL CORPORATION, | : | Consol. Court No. 11-00102 |
| *Defendant-Intervenor*. | : | PUBLIC |
| MID CONTINENT NAIL CORPORATION, | : | |
| *Plaintiff*, | : | |
| v. | : | |
| UNITED STATES, | : | |
| *Defendant*, | : | |
| and | : | |
| THE STANLEY WORKS (LANGFANG) FASTENING SYSTEMS CO., LTD. and THE STANLEY WORKS/STANLEY FASTENING SYSTEMS, LP, | : : : | |
| *Defendant-Intervenors*. | : | |

[Denying Stanley's Motion for Judgment on the Agency Record; Granting in part and denying in part Mid Continent's Motion for Judgment on the Agency Record; Granting Government's Motion for

Partial Voluntary Remand]

Dated: September 3, 2013

Lawrence J. Bogard, Neville Peterson LLP, of Washington, D.C., argued for The Stanley Works (Langfang) Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems, LP.  With him on the brief was Meredith A. Dement.

Carrie A. Dunsmore, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was Nathaniel J. Halvorson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

Adam H. Gordon, Wiley Rein LLP, of Washington, D.C., argued for Mid Continent Nail Corporation.  With him on the brief were Robert E. DeFrancesco, III and Lori E. Scheetz.

# OPINION

RIDGWAY, Judge:

In this consolidated action, foreign exporters of steel nails The Stanley Works (Langfang)

Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems, LP (collectively

"Stanley") and domestic producer of steel nails Mid Continent Nail Corporation ("Mid Continent")

contest the final results, as amended, of the U.S. Department of Commerce's first administrative

review[1] of the antidumping duty order covering steel nails from the People's Republic of China

("PRC").  *See* Certain Steel Nails from the People's Republic of China: Final Results of the First

---

[1]The period of review for this first administrative review is January 23, 2008 to July 31, 2009. *See* Certain Steel Nails from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the First Antidumping Duty Administrative Review at 2 (March 14, 2011) (Pub. Doc. No. 381) ("Issues & Decision Memorandum").

Antidumping Duty Administrative Review, 76 Fed. Reg. 16,379 (March 23, 2011) ("Final Results");

Certain Steel Nails from the People's Republic of China: Amended Final Results of the First

Antidumping Duty Administrative Review, 76 Fed. Reg. 23,279 (April 26, 2011) ("Amended Final

Results").[2]

Pending before the court are three separate motions:  Mid Continent's Motion for Judgment

on the Agency Record, Stanley's Motion for Judgment on the Agency Record, and Defendant United

States' Motion for Partial Voluntary Remand.

Mid Continent contests four aspects of Commerce's Final Results   specifically, Commerce's

decision not to use the intermediate input methodology when calculating Stanley's normal value,

Commerce's decision not to apply adverse facts available to missing factors of production data,

Commerce's selection of sources for surrogate financial ratios, and Commerce's selection of data

for surrogate electricity values. *See generally* Amended Memorandum in Support of Mid Continent

---

[2]Because business proprietary information was submitted in the course of the administrative review, there are two versions of the administrative record   a public version and a confidential version.  The public version of the record consists of copies of all documents in the record of this action, with confidential information redacted.  The confidential version consists of complete, unredacted copies of only those documents that include confidential information.

Documents in the public version of the administrative record are numbered sequentially, and are cited herein as "Pub. Doc. No. ____."  Documents in the confidential version of the administrative record are also numbered sequentially, but differently from the public version. Documents in the confidential version of the administrative record are cited as "Conf. Doc. No. ____."

Mid Continent and Stanley filed both public and confidential versions of all briefs.  Citations to briefs are to the public versions whenever possible, and except as specified.  Citations to the confidential version of a brief are prefaced with "Conf."

Nail Corporation's Rule 56.2 Amended Motion for Judgment on the Agency Record ("Mid Continent Brief"); Reply Brief of Mid Continent Nail Corporation ("Mid Continent Reply Brief").[3] Stanley and the Government oppose Mid Continent's motion.  *See generally* Memorandum of Plaintiffs The Stanley Works (Langfang) Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems, LP in Opposition to Mid Continent's Rule 56.2 Motion for Judgment Upon the Administrative Record ("Stanley Response Brief"); Defendant's Memorandum in Opposition to Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record ("Def.'s Brief").

Stanley, in turn, challenges Commerce's refusal to correct what Stanley maintains is a "ministerial error" relating to the calculation of normal value for Stanley's nails.  *See generally* Memorandum of Plaintiffs The Stanley Works (Langfang) Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems LP in Support of Their Rule 56.2 Motion for Judgment Upon the Agency Record ("Stanley Brief"); Plaintiffs' Memorandum in Reply to Defendant's and Defendant-Intervenor's Opposition to Plaintiffs' Motion for Judgment on the Agency Record

---

[3]Seven of the 10 counts in the Complaint that Mid Continent filed in a companion case contesting the same final results (Court No. 11-00119) were consolidated into the instant action. *See* Order (Sept. 16, 2011) (consolidating Counts II through IV and Counts VII through X of Complaint in Court No. 11-00119 into instant action).

Mid Continent has elected not to pursue certain counts consolidated from Court No. 11-00119    specifically, Count IV (which challenged Commerce's selection of surrogate values for sodium hydroxide, labels, and shrink film), Count IX (which alleged that Commerce failed to properly calculate Stanley's reported U.S. indirect selling expenses), and Count X (which alleged generally that Commerce "erred in other aspects of the Final Results").  *See* Mid Continent Brief at 1 n.2.

("Stanley Reply Brief").[4]   Mid Continent and the Government oppose Stanley's motion.  *See*

*generally* Response Brief of Mid Continent Nail Corporation ("Mid Continent Response Brief");

Def.'s Brief.

The Government maintains that the Final Results should be sustained in all respects, save

one.  *See* Def.'s Brief; Defendant's Motion for Partial Voluntary Remand ("Def.'s Remand

Motion").  Specifically, the Government requests a partial voluntary remand to permit Commerce

to reconsider the selection of financial statements used for Stanley's surrogate financial ratios in the

Final Results.  *See generally* Def.'s Remand Motion.  Mid Continent supports the Government's

motion; Stanley opposes it.  *See generally* Response of Mid Continent Nail Corporation to

Defendant United States' Motion for Partial Voluntary Remand ("Mid Continent Response to Def.'s

Remand Motion"); Plaintiffs' Opposition to Defendant's Motion for Partial Voluntary Remand

("Stanley Response to Def.'s Remand Motion").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[5]   For the reasons set forth below,

Stanley's Motion for Judgment on the Agency Record must be denied, and Mid Continent's Motion

for Judgment on the Agency Record must be granted in part and denied in part.  In addition, the

Government's Motion for Partial Voluntary Remand must be granted.

---

[4]In its Complaint and briefs, Stanley also challenged Commerce's use of "zeroing" in
calculating Stanley's dumping margin.  Stanley Complaint ¶¶ 20-21; Stanley Brief at 13-25, 31;
Stanley Reply Brief at 2-14.  However, in light of the decision in Union Steel, Stanley withdrew its
zeroing claim.  *See* Union Steel v. United States, 713 F.3d 1101 (Fed. Cir. 2013); Order (July 17,
2013) (dismissing Stanley's zeroing claim).

[5]All citations to federal statutes are to the 2006 edition of the United States Code.  Similarly,
all citations to federal regulations are to the 2008 edition of the Code of Federal Regulations.

# I. __Background__

In September 2009, Commerce initiated its first administrative review of the antidumping

duty order on certain steel nails from the People's Republic of China ("PRC"), covering the period

of review January 23, 2008 to July 31, 2009.  *See* Initiation of Antidumping and Countervailing Duty

Administrative Reviews and Request for Revocation in Part, 74 Fed. Reg. 48,224 (Sept. 22, 2009).

Pursuant to its standard practice, Commerce issued questionnaires to the selected respondents,

including Stanley, requesting information from Stanley, among others, about the factors of

production consumed in the production of one kilogram of the subject merchandise   *i.e.*,  finished

nails that may be collated (strung together) into strips or coils using materials such as plastic, paper,

or wire, to form strips or coils that can be loaded into a nail gun.   *See* Response of Stanley to the

Commerce Department's Antidumping Duty Questionnaire, Response to Section C (Pub. Doc. No.

159) ("Stanley's Response to Section C Questionnaire"); Response of Stanley to the Commerce

Department's Antidumping Duty Questionnaire, Response to Section D (Pub. Doc. No. 160)

("Stanley's Response to Section D Questionnaire").[6]  Stanley reported that all of its nails were

---

[6]Factors of production "include, but are not limited to . . . hours of labor required, . . .
quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . .
representative capital cost, including depreciation."  *See* 19 U.S.C. § 1677b(c)(3); *see also* __Dorbest__
__Ltd. v. United States__, 604 F.3d 1363, 1367 (Fed. Cir. 2010) (discussing factors of production).

In selecting surrogate values for factors of production, Commerce seeks the "best available
information" in accordance with 19 U.S.C. § 1677b(c)(1).  Def.'s Brief at 23.  In evaluating potential
sources, Commerce prefers "investigation or review period-wide price averages, prices specific to
the input in question, prices that are net of taxes and import duties, prices that are contemporaneous
with the period of investigation or review, and publicly available data."  Import Administration
Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process, at "Data

collated, the style of collation used in each sale, and the collating material for each style.  *See*

Stanley's Response to Section C Questionnaire.  Stanley then reported the quantities of each factor

of production used in producing one kilogram of nails.  *Id*.

The primary factor of production for nails is wire rod.  *See generally* Surrogate Values for

the Preliminary Results (Pub. Doc. No. 287) ("Surrogate Valuation Memorandum for the Preliminary

Results").  To make nails, wire rod is drawn so that it becomes wire.  *Id*.  Nail manufacturers either

draw the wire rod into wire in their own facilities or contract with companies ("tollers") who draw

wire rod into wire as needed.  *Id*.  In this case, Stanley explained that, as an integrated producer, it

contracts with wire drawers to draw a portion of its wire rod into wire rather than itself drawing all

of the wire rod that it requires.  *See* Stanley's Response to Section D Questionnaire.  In addition,

Stanley stated that, although it was able to provide data for the "substantial majority" of its

subcontractors, it was unable to obtain information from certain of these wire drawers about how

much wire rod they consumed to produce the amount of wire supplied to Stanley.  *See* Stanley's

Response to Section D Questionnaire; Issues & Decision Memorandum at 33 n.90 (comment 17).

Commerce also requested that Stanley report how much wire it used to produce its nails.  *See*

Supplemental Questionnaire for Section D (Pub. Doc. No. 233).  Wire, in contrast to wire rod, is not

a factor of production, but, rather, an "intermediate input."[7]  *See generally* Surrogate Valuation

---

Considerations" (March 1, 2004) ("Policy Bulletin 04.1"); *see also* Issues & Decision Memorandum
at 13 (comment 4); Def.'s Brief at 23 (similar).

[7]Intermediate inputs are distinct from factors of production; and Commerce's criteria for
evaluating intermediate inputs differ from those for factors of production.  *See* Certain Frozen Fish
Fillets From the Socialist Republic of Vietnam, 68 Fed. Reg. 4986 (Jan. 31, 2003) (preliminary
results of administrative review).

Memorandum for the Preliminary Results.  Stanley provided complete data for its wire consumption.  *See* Part 2 of Supplemental Section D Questionnaire Response of Stanley (Pub. Doc. No. 253).

Commerce subsequently published its Preliminary Results.  *See generally* Certain Steel Nails From the People's Republic of China:  Notice of Preliminary Results and Preliminary Rescission, in Part, of the Antidumping Duty Administrative Review, 75 Fed. Reg. 56,070 (Sept. 15, 2010) ("Preliminary Results").  In the Preliminary Results, Commerce calculated a preliminary dumping margin for Stanley    at 6.48%    using "facts otherwise available" (or "neutral facts") to fill the gaps in Stanley's wire rod data.  *See* Preliminary Results, 75 Fed. Reg. at 56,077.[8]

In addition to wire rod, the Preliminary Results also analyzed Stanley's other factors of production.  Electricity**,** for example, plays a major role in the production of nails.  *See* Surrogate Valuation Memorandum for the Preliminary Results at 11.  As a surrogate value for electricity in calculating the Preliminary Results, Commerce used historical data published by India's Central Electricity Authority in March 2008.  *See* Surrogate Valuation Memorandum for the Preliminary

---

[8]In addition to its issuance of the Preliminary Results, Commerce also provided detailed explanations of its calculations in its September 7, 2010 Preliminary Calculation Memorandum for Stanley.  Preliminary Calculation Memorandum for Stanley (Pub. Doc. No. 290) ("Preliminary Calculation Memorandum").  Using Stanley's reported data to calculate normal value for Stanley, Commerce added the costs of all the factors of production    including the plastic, paper, and wire collating material used to collate the nails    and obtained a price for the normal value of collated nails stated in terms of dollars per kilogram.  *See id*.  Commerce explained that it calculated United States price by converting the price of a carton of subject merchandise to the price of a kilogram of subject merchandise, using the weight of the finished nails plus the collating material, so that United States price could be compared to normal value.  *Id*.

Commerce's calculations refer to the weight of nails plus collating material as "CONWGT3U"; the weight of nails alone is identified as "CONWGT4U."  *See generally* Preliminary Calculation Memorandum at 1-8.

Results at 11; Issues & Decision Memorandum at 15 (comment 5). Those data reflected "tax-exclusive electricity rates charged to small, medium, and large industries in India." *See* Surrogate Valuation Memorandum for the Preliminary Results at 11.

Further, because valuing product-specific factors of production does not capture certain overall "general expenses and profits," Commerce must separately reflect in the agency's calculation of normal value (1) factory overhead, (2) selling, general, and administrative expenses ("SG&A"), and (3) profit. 19 U.S.C. § 1677b(c)(1). As with other factors of production, Commerce uses surrogate values to determine a respondent's financial ratios, relying on the financial statements of one or more producers of identical or comparable merchandise, which serve as surrogates for this purpose. *See generally* Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1319-20 (Fed. Cir. 2010) (providing overview of use of financial statements to determine surrogate financial ratios). In the Preliminary Results here, Commerce relied on the financial statement of a large, multinational Indian producer of fasteners, Lakshmi Precision Screws Ltd. ("Lakshmi"). *See* Surrogate Value Memorandum for the Preliminary Results. According to Commerce, Lakshmi produced "comparable" merchandise, and its financial statement provided the best available information due to the company's use of "an integrated wire-drawing production process with steel wire rod as the main input, which closely mirrors [the process] of the respondents." *See* Surrogate Valuation Memorandum for the Preliminary Results at 15-16.

Between mid-November and mid-December 2010, Commerce conducted a "successful[]" verification of Stanley's factors of production and U.S. sales questionnaire responses, as well as the factors of production data from one of Stanley's unaffiliated wiredrawing subcontractors. *See* Final

Results, 76 Fed. Reg. at 16,380; Issues & Decision Memorandum at 36 (comment 18).   At verification, Stanley provided Commerce with further information and explanation regarding Stanley's missing factors of production data.   *See generally* Verification Report for Stanley (Pub. Doc. No. 352).

Following issuance of the Preliminary Results and completion of verification, Commerce solicited and received administrative case briefs and rebuttal briefs from Mid Continent, Stanley, and other interested parties.   Final Results, 76 Fed. Reg. at 16,380.   In its administrative case brief, Mid Continent challenged Commerce's determination to use "facts otherwise available" (*i.e.*, neutral facts) to substitute for Stanley's missing wire rod data.   Mid Continent Case Brief (Pub. Doc. No. 367) at 15.   Mid Continent argued that Commerce instead should use the agency's "intermediate input methodology" or apply "adverse facts available."   *See generally* Mid Continent Case Brief. Under Commerce's intermediate input methodology, Commerce directly calculates the value of an intermediate input (such as wire) rather than valuing and then adding up all the separate individual factors of production that go into the production of that intermediate input (such as wire rod and wiredrawing services).   *See*, *e.g.*, Zhengzhou Harmoni Spice Co. v. United States, 33 CIT 453, 458-66, 617 F. Supp. 2d 1281, 1289-95 (2009).   "Adverse facts available" (or "adverse inferences") are substitutes for missing information that are adverse to the interests of a party that has refused to cooperate with Commerce's information requests. *See*, *e.g.*, Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1321 (Fed. Cir. 2010).

Also discussed in Mid Continent's administrative case brief was electricity.   Mid Continent contended that the use of the March 2008 report by the Central Electricity Authority did not reflect

the most contemporaneous information, and did not represent the best available information.  *See* Mid Continent Case Brief at 53-54.  According to Mid Continent, Commerce should have used data released in late March 2009 (which Mid Continent had placed on the record prior to filing its case brief), reflecting "updated electricity pricing in effect for a significant portion of the [period of review]" and "updated energy pricing" for certain Indian consumers.  Mid Continent Case Brief at 53.

In addition, Mid Continent's administrative case brief challenged Commerce's reliance on Lakshmi's financial statement for use in calculating the financial ratios, and submitted certain financial data for Sundram Fasteners Ltd. ("Sundram").  *See* Mid Continent Case Brief at 6, 41-46; Mid Continent Surrogate Value Submission (Pub. Doc. No. 301) (exhibit including 2009 and 2010 Limited Annual Reports for Sundram).  Mid Continent urged Commerce to use Sundram's data for purposes of the Final Results, emphasizing that    like Lakshmi    Sundram was a multi-national producer of fasteners, with a financial and production scale comparable to that of Stanley.  *See* Mid Continent Case Brief; Mid Continent Surrogate Value Submission.

The Chinese respondents submitted other financial statements as possible sources for surrogate financial ratios, including statements from several significantly smaller Indian companies, including J&K Wire & Steel Industries (Pvt.) Ltd. ("J&K"), Bansidhar Granites Private Limited ("Bansidhar"), and Nasco Steels Private Ltd. ("Nasco").  *See* GDLSK Section A Client's Second Surrogate Value Submission at Exhs. 1-3 (Pub. Doc. No. 299) (financial statements of Bansidhar, J&K, and Lakshmi); Stanley Resubmission of Comments (Pub. Doc. No. 330) (financial statements for Nasco).  In its administrative case brief and its rebuttal brief filed with the agency, Mid Continent

argued that use of the financial statements of J&K, Bansidhar, and Nasco would be inappropriate. *See generally* Mid Continent Rebuttal Brief (Pub. Doc. No. 370).   According to Mid Continent, unlike the companies whose financial statements Mid Continent placed on the record, the production and financial experience of J&K, Bansidhar, and Nasco bore no similarity to that of Stanley.  *See id*. at 22-37.

In the administrative case brief that Stanley filed with Commerce, Stanley challenged a number of issues, including Commerce's decision to use zeroing to calculate Stanley's dumping margin in the administrative review (an issue that Stanley initially pursued in this litigation, but has since dismissed).   *See* Stanley Case Brief (Pub. Doc. No. 365) at 14-19.   However, Stanley's administrative case brief said nothing about Commerce's calculations regarding the weight basis for nails used in calculating normal value.  *See* Stanley Case Brief.

After considering the evidence and arguments on the record, Commerce issued the Final Results of the administrative review.  *See generally* Final Results, 76 Fed. Reg. 16,379.  In the Final Results, Commerce declined to use the intermediate input methodology in calculating Stanley's normal value, and explained that it used facts otherwise available (*i.e.*, neutral facts)    rather than adverse facts available    to fill the gaps in Stanley's data on wiredrawing factors of production.  *See* Issues & Decision Memorandum at 32-36 (comments 17-18).  The Final Results found that the use of adverse facts available was not warranted, because Stanley was forthcoming about the deficiencies in its factors of production data and because Commerce had not requested that Stanley make additional attempts to obtain the missing data or demonstrate that it had made such attempts. Commerce therefore did not conclude that Stanley had failed to cooperate by not acting to the best

of its ability to comply with an agency request for information.  *See* Issues & Decision Memorandum at 34 (comment 17).

As a surrogate value for electricity, the Final Results continued to use the data from India's Central Electricity Authority published in March 2008.  Issues & Decision Memorandum at 15 (comment 5).  Commerce explained that the rates in that publication reflected the rates in effect for more of the period of review than the rates contained in the March 2009 data that Mid Continent had placed on the record, and thus were more "contemporaneous."  *Id*.

Commerce also reviewed all five financial statements on the record and modified its financial ratio calculations, relying on the financial statements of Bansidhar, J&K, and Nasco.  Issues & Decision Memorandum at 11-13 (comment 3).  Commerce explained that each of the three companies is an integrated producer of nails, produces nails from steel wire rod, and has invested in the capital equipment necessary to produce nails from steel wire rod.  *Id*.  Commerce decided not to rely on Lakshmi's financial statement, because the agency had discovered evidence of a countervailable subsidy on the company's financial statements.  *Id*.[9]  Commerce also declined to use Sundram's financial statements, explaining that Sundram is not an integrated producer of nails and does not consume steel wire rod in its production of nails.  Issues & Decision Memorandum at 11 (comment 3).

Following issuance of the Final Results, Stanley submitted ministerial error allegations.  *See*

---

[9]Commerce generally does not rely on the financial statement of a company "where there is evidence that the company received countervailable subsidies and there are other sufficient[ly] reliable and representative data on the record."  Issues & Decision Memorandum at 11 (comment 3).

Stanley's Request for Correction of Significant Ministerial Errors (Pub. Doc. No. 387).  Stanley

alleged that the Final Results contained two ministerial errors.  *Id*.  Stanley first alleged that

Commerce had inadvertently calculated depreciation using a "total" rather than an "annual" figure.

*Id*. at 2-4.  Commerce corrected that error, and adjusted Stanley's margin accordingly.  In addition,

Stanley alleged a ministerial error concerning the weight basis for nails used in calculating normal

value.  *Id*. at 5-9.  Commerce disagreed with Stanley's second point, explaining that its calculation

was intentional, and that there was no ministerial error.  *See* Ministerial Error Memorandum (Pub.

Doc. No. 393) at 3-4.  Commerce further noted that the weight basis used in the Final Results was

the same as the weight basis used in the Preliminary Calculation Memorandum for Stanley.  *Id*.; *see*

*also* Preliminary Calculation Memorandum for Stanley (Pub. Doc. No. 290) ("Preliminary

Calculation Memorandum").  Commerce's Amended Final Results therefore reflected an adjustment

to Stanley's margin only for the company's first allegation of ministerial error.  *See* Amended Final

Results, 76 Fed. Reg. at 23,280.  The Amended Final Results adjusted Stanley's margin from 13.9%

to 10.63%.  *Id*.

     This action ensued.

     After briefing was complete on the merits of Mid Continent's challenge to the Final Results'

reliance on the financial statements of Bansidhar, Nasco, and J&K, Commerce   in the second

administrative review of the same antidumping duty order at issue here   refined its practice for

determining whether a company is a producer of "comparable" or "identical" merchandise for

purposes of analyzing potential surrogates for financial ratios.  *See* Issues and Decision

Memorandum for Certain Steel Nails from the People's Republic of China: Final Results of the

Second Antidumping Duty Administrative Review, 2012 WL 699520 at Comment 2 (Feb. 23, 2012) ("Decision Memorandum for Second Nails Review"). Thereafter, the Government requested a voluntary remand to allow Commerce to reevaluate its determination concerning surrogate financial ratios in this administrative review. *See* Def.'s Remand Motion at 2-3.

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same). Moreover, any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same). That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence. Am. Silicon Techs. v.

United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n,

383 U.S. 607, 620 (1966).

While Commerce must explain the bases for its decisions, "its explanations do not have

to be perfect."  NMB Singapore, 557 F.3d at 1319.  Nevertheless, "the path of Commerce's

decision must be reasonably discernable," to support judicial review.  *Id*. (*citing* Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see generally* 19 U.S.C.

§ 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of

the basis for its determination").

## III.  Analysis

Dumping occurs when goods are imported into the United States and sold at a price lower

than their "normal value," resulting in material injury (or the threat of material injury) to the U.S.

industry.  *See* Taian Ziyang Food Co. v. United States, 35 CIT ____, ____, 783 F. Supp. 2d 1292,

1299 (2011) (*citing* 19 U.S.C. §§ 1673, 1677(34), 1677b(a)); *see generally id*., 35 CIT at ____, 783

F. Supp. 2d at 1299-1302.  The difference between the normal value of the goods and the U.S. price

is the "dumping margin."  *See* 19 U.S.C. § 1677(35).  When normal value is compared to the U.S.

price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset

the dumping.  *See* 19 U.S.C. § 1673.

Normal value is typically calculated using either the price in the exporting market (*i.e.*, the

price in the "home market" where the goods are produced) or the cost of production of the goods,

when the exporting country is a market economy country.  *See generally* 19 U.S.C. § 1677b.[10]

However, where   as here   the exporting country has a non-market economy ("NME"), there is

often concern that the factors of production used to produce the goods at issue are under state

control, and that home market sales may not be reliable indicators of normal value.  *See* 19 U.S.C.

§ 1677(18)(A).

In cases such as this, where Commerce concludes that concerns about the sufficiency or

reliability of the available data do not permit the normal value of the goods to be determined in the

typical manner, Commerce "determine[s] the normal value of the subject merchandise on the basis

of the value of the factors of production," including "an amount for general expenses and profit plus

the cost of containers, coverings, and other expenses."  *See* 19 U.S.C. § 1677b(c)(1); *see generally*

Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009) (briefly

summarizing "factors of production" methodology).  The antidumping statute requires Commerce

to value factors of production "based on the *best available information* regarding the values of such

factors" in an appropriate surrogate market economy country   in this case, India.  *See* 19 U.S.C. §

1677b(c)(1) (emphasis added); *see also* Shakeproof Assembly Components v. United States, 268

F.3d 1376, 1382 (Fed. Cir. 2001); Ningbo, 580 F.3d at 1254 (emphasizing that statute mandates that

Commerce "shall" use "best available information" in valuing factors of production).

In determining which data constitute the "best available information," Commerce generally

---

[10]In addition, in certain market economy cases, Commerce may calculate normal value using the price in a third country (*i.e.*, a country other than the exporting country or the United States). *See*, *e.g.*, RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1338 (Fed. Cir. 2002) (discussing 19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(1)(C)); *see also* Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1251 n.1 (Fed. Cir. 2009) (explaining exception).

looks to the criteria set forth in its "Policy Bulletin 04.1," also known as the "NME Surrogate

Country Policy Bulletin."  Policy Bulletin 04.1 explains:

> In assessing data and data sources, it is [Commerce's] stated practice to use
> investigation or review period-wide price averages, prices specific to the input in
> question, prices that are net of taxes and import duties, prices that are
> contemporaneous with the period of investigation or review, and publicly available
> data.

*See* Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection

Process, at "Data Considerations" (March 1, 2004).[11]

Within this general framework, the statute "accords Commerce wide discretion in the

valuation of factors of production in the application of [the statute's] guidelines."  *See* Shakeproof,

268 F.3d at 1381 (internal quotation marks and citation omitted); *see also* Ad Hoc Shrimp Trade

Action Committee v. United States, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (same); Nation Ford

Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (same).  Commerce is recognized

as the "master of antidumping law."  *See* Thai Pineapple Public Co. v. United States, 187 F.3d 1362,

1365 (Fed. Cir. 1999); *see also* Shakeproof, 268 F.3d at 1381 (acknowledging "Commerce's special

expertise").  And "[t]he process of constructing foreign market value for a producer in a non-market

economy country is difficult and necessarily imprecise."  *Id*.

---

[11]Policy Bulletin 04.1 clearly states that the five specified criteria  *i.e.*, "investigation or
review period-wide price averages, prices specific to the input in question, prices that are net of taxes
and import duties, prices that are contemporaneous with the period of investigation or review, and
publicly available data"  were developed to serve as a "tie-breaker," if necessary, in Commerce's
identification of a surrogate country.  *See* Taian Ziyang, 35 CIT at _____ n.8, 783 F. Supp. 2d at 1300
n.8.  The criteria were not promulgated for the purpose of guiding Commerce's selection from
among alternative data sources *after* a surrogate country has been identified.  *Id*.  Nevertheless,
Commerce has used the criteria for that purpose here and in many other cases.  *Id*.

Nevertheless, Commerce's discretion is not boundless.  In exercising its discretion, Commerce is constrained by the purpose of the antidumping statute, which is "to determine antidumping margins 'as accurately as possible.'"  *See* Shakeproof, 268 F.3d at 1382 (*quoting* Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).  And, Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible."  *See* Nation Ford, 166 F.3d at 1377 (internal quotation marks and citation omitted).  Thus, "[i]n determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on *the best available information* and establishes antidumping margins *as accurately as possible*."  *See* Ningbo, 580 F.3d at 1257 (emphases added) (*quoting* Shakeproof, 268 F.3d at 1382) (internal quotation marks omitted).

In the present case, Stanley and Mid Continent challenge multiple aspects of Commerce's Final Results in the first administrative review of steel nails from the PRC.  As discussed in greater detail below, Commerce's decisions not to use intermediate input methodology, not to apply adverse facts available, and not to "correct" an alleged ministerial error must be sustained.  *See* sections III.A, III.B & III.E, *infra*.  On the other hand, Commerce's selection of sources for Stanley's surrogate financial ratios and Commerce's valuation of Stanley's electricity must be remanded to the agency for further consideration.  *See* sections III.C & III.D, *infra*.

A.  Intermediate Input Methodology

Mid Continent challenges Commerce's normal value calculation for Stanley's nails, arguing

that   in light of Stanley's missing factors of production data   Commerce erred by applying its "factors of production" methodology, and instead should have used the agency's "intermediate input" methodology.  *See generally* Mid Continent Brief at 7-11; Mid Continent Reply Brief at 1-4. Mid Continent contends that this case fits comfortably within both of the two   exceptions to Commerce's standard factors of production methodology.  *See* Mid Continent Brief at 8-11; Mid Continent Reply Brief at 2-4.  However, for the reasons described below, Mid Continent's arguments must be rejected.

In NME antidumping proceedings, Commerce typically "determine[s] the normal value of the subject merchandise on the basis of the *value of the factors of production* . . . based on the best available information regarding the values of such factors in a market economy country."  19 U.S.C. § 1677b(c)(1) (emphasis added).  However, in some situations, Commerce resorts to an alternative approach for determining normal value   the so-called intermediate input methodology.  *See generally* Zhengzhou Harmoni Spice Co. v. United States, 33 CIT 453, 458-466, 617 F. Supp. 2d 1281, 1289-95 (2009) (recognizing Commerce's discretion to rely on intermediate input methodology under certain circumstances).

There are two exceptions to Commerce's factors of production methodology that can give rise to a need for the intermediate input methodology   the insignificant share exception and the significant element exception.  *See* Issues & Decision Memorandum at 35 (comment 18) (discussing two exceptions); *see also* Issues and Decision Memorandum for Antidumping Duty Investigation of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 2003 WL 24153843 at Comment 3 (June 23, 2003) ("Fish Fillets Decision Memorandum") (same); Issues and Decision

Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Ball

Bearings and Parts Thereof from the People's Republic of China, 2003 WL 24153825 at Comment

6 (March 6, 2003) ("Ball Bearings Decision Memorandum") (same); Zhengzhou Harmoni Spice Co.,

33 CIT at 461 n.14, 617 F. Supp. 2d at 1292 n.14 (same).  As detailed below, neither exception

applies here.[12]

### 1. The Insignificant Share Exception

Mid Continent contends that Commerce should have applied the intermediate input

methodology based on the insignificant share exception.  *See* Mid Continent Brief at 8-9; Mid

---

[12]Mid Continent's other arguments challenging Commerce's decision not to apply the intermediate input methodology are also unavailing.

Mid Continent contends that Commerce failed to articulate a satisfactory rationale for rejecting complete data for wire that could have been used if Commerce had relied on the intermediate input methodology. Mid Continent Brief at 11. However, as Commerce explained in its Issues and Decision Memorandum, the amount of steel wire consumed by a company such as Stanley, which is an integrated producer, is not necessarily reflective of its costs. Def.'s Brief at 15 (*citing* Issues & Decision Memorandum at 36). Based on this consideration and Commerce's "successful[]" verification of Stanley's subcontractor's wiredrawing factors of production, Commerce found use of Stanley's wiredrawing factors of production to be "more accurate" than Mid Continent's proposed intermediate input methodology. Issues & Decision Memorandum at 36 (comment 18). Mid Continent's contention that Commerce did not satisfactorily address why factors of production data are preferable to intermediate input data for Stanley thus has no merit.

In addition, Mid Continent argues that using Stanley's incomplete factors of production data "fundamentally inhibits the accuracy of the traditional factors of production methodology, and thus undermines the accuracy of the margin calculations." Mid Continent Reply Brief at 2. Mid Continent faults Commerce for not articulating its reasons for concluding that the amount of missing wiredrawing data was small. *Id*. at 4. Yet the missing portion of data represented less than one-third of the wiredrawing costs, and   by Mid Continent's own admission   wiredrawing services accounted for an insignificant percentage of the normal value of Stanley's nails. *See* Mid Continent Amended Conf. Brief at 9; Mid Continent Conf. Reply Brief at 2-3; *see also* Stanley Conf. Response Brief at 22. Mid Continent's arguments are not persuasive.

Continent Reply Brief at 3. Commerce invokes the insignificant share exception as an alternative to the agency's standard factors of production methodology where "the factors [of production] used to produce an intermediate input represent a small or insignificant share of total output" and where the improvement to the overall accuracy of the normal value calculation "will be too small to justify the burden of valuing the factors." Issues & Decision Memorandum at 35 (comment 18).

Mid Continent's argument for the application of the exception is that the wiredrawing services of Stanley's subcontractors constituted an insignificant share of total output cost. *See* Mid Continent Brief at 9 (arguing that, "based on the database that [Commerce] used for its *Preliminary Results*," wiredrawing services "by no means constitute[d] a significant share of the total output cost"); *see also* Mid Continent Reply Brief at 3.[13] However, in making its argument, Mid Continent misapplies the requirements for the insignificant share exception by focusing solely on whether one of the factors of production (wiredrawing services) was insignificant, rather than on whether the factors of production, taken together, represented such an insignificant share of total output that calculating values for each of them would not be worthwhile in valuing the intermediate input wire.

The insignificant share exception does not apply merely because, as Mid Continent contends, one of the factors of production (wiredrawing services) for the intermediate input (drawn wire) represented an insignificant share of total output. When considering whether to apply the insignificant share exception, Commerce focuses on the significance of the intermediate input itself

---

[13]Mid Continent explains that, based on its own calculations, the wiredrawing factors of production (exclusive of wire rod) comprise [[     ]]% and [[     ]]% of the total cost and normal value, respectively, of Stanley's nails. *See* Mid Continent Amended Conf. Brief at 9; Mid Continent Conf. Reply Brief at 9; *see also* Stanley Conf. Response Brief at 22.

(or, in other words, *all* of the factors of production that make up the intermediate input), not on the

significance of any one particular factor of production used to produce the intermediate input.  *See*

Stanley Response Brief at 23.  As stated in Wooden Bedroom Furniture from the PRC, Commerce

"appl[ies] a surrogate value to an intermediate input"

> when the *intermediate input* accounts for an insignificant share of total output, and
> the potential increase in accuracy to the overall calculation that results from valuing
> each of the [factors of production] is outweighed by the resources, time, and burden
> such an analysis would place on all of the parties to the proceeding.

Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative

Review and New Shipper Review of Wooden Bedroom Furniture from the People's Republic of

China, 2008 WL 8608280 at Comment 29 (Aug. 11, 2008) ("Wooden Bedroom Furniture Decision

Memorandum") (emphasis added).[14]

Further, Mid Continent contends that, in refusing to apply the exception here, Commerce

wrongly focused on whether wire rod represented a significant share of total output.  Mid Continent

Brief at 11 (stating that Commerce conducted "the wrong analysis" by noting that "the main factor

used to value the intermediate good, drawn wire, is rod, which represents a significant share of total

output").  But Mid Continent's argument is unavailing.  By focusing on the significance of wire rod

as a factor of production in its decision that the insignificant share exception does not apply here,

---

[14]In Wooden Furniture from the PRC, Commerce decided not to use the intermediate input
methodology in valuing bun feet and veneered boards, because Commerce found that "if [the
agency] did not use a [factors of production] buildup for the veneering service and for valuing bun
feet from subcontractors to whom [the producer] provided wood, it would lead to an inaccurate
result."  Wooden Bedroom Furniture Decision Memorandum at Comment 29.  Similarly, here,
Commerce found that using the verified factors of production for Stanley's drawn wire rather than
Mid Continent's "proxy calculation" (*i.e.*, intermediate input methodology calculation) would lead
to a "more accurate" result.  Issues & Decision Memorandum at 36 (comment 18).

Commerce indicated that not all of the factors used to produce wire represent insignificant shares of total output, and that, accordingly, the insignificant share exception did not apply.  Issues & Decision Memorandum at 35 (comment 18).[15]

In sum, Commerce reasonably found that, because the main factor of production (wire rod) for the intermediate input (drawn wire) "represents a significant share of total output," the insignificant share exception did not apply and could not justify a departure from the agency's standard factors of production methodology.  Issues & Decision Memorandum at 35-36 (comment 18).  Mid Continent's argument to the contrary is without merit.

## 2.  The Significant Element Exception

Mid Continent also contends that Commerce should have applied the intermediate input methodology based on the significant element exception.  *See* Mid Continent Brief at 8-11; Mid Continent Reply Brief at 2-3, 4.  Commerce invokes the significant element exception where a significant portion of the costs of the factors of production for an intermediate input cannot be accounted for by Commerce.  Issues & Decision Memorandum at 35 (comment 18).  Mid Continent's argument for the second exception is that the intermediate input methodology should

---

[15]Mid Continent further argues that Commerce "overlook[ed] the fact that the outside wire drawers did not own the wire rod    Stanley did." Mid Continent Brief at 11 (noting that "Stanley made quite a point during the review of specifically treating drawing services as the <u>only</u> thing it acquired from the [subcontractors]"). Mid Continent's argument misses the mark because the focus of the insignificant share exception here is not whether outside services comprised an insignificant share of total output, but (as described above) whether the factors used to produce drawn wire, taken together, represent an insignificant share of total output. Thus, when determining whether the insignificant share exception applies, Commerce would not only consider the wiredrawing services factors of production but also the wire rod factors of production.

be applied because factors of production data were missing for what Mid Continent contends was a significant portion of the wire consumed by Stanley.  Mid Continent Brief at 8-11; Mid Continent Reply Brief at 2-3, 4.[16]  However, Commerce's decision to reject the significant element exception as a basis for departing from the agency's standard factors of production methodology was reasonable.

The wiredrawing factors of production of Stanley's subcontractors account for only a small portion of the normal value of Stanley's nails, and the wire drawers whose factors of production Stanley did not report accounted for less than one-third of Stanley's drawn wire.  Stanley Response Brief at 24.  In other words, Commerce had factors of production data that accounted for more than two-thirds of Stanley's drawn wire.  *Id*. at 24-25.  As such, Commerce did not act unreasonably by deciding that the missing wiredrawing factors of production data were not significant enough to merit the application of the intermediate input methodology through the significant element exception.  As the "master of antidumping law" with "special expertise," Commerce must be afforded some discretion under circumstances such as these.  *See* Thai Pineapple Public Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999); Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1381 (Fed. Cir. 2001).

In sum, Commerce reasonably found that neither of the two exceptions was applicable here, and that, based on agency practice, it would not be appropriate to apply the intermediate input methodology given the circumstances of this case.  Mid Continent's arguments for use of

---

[16]Stanley did not submit data for [[   ]] of its subcontractors.  As a result, Commerce was missing factors of production data for [[   ]]% of Stanley's total wire consumed during the period of review.  Mid Continent Amended Conf. Brief at 9.

Commerce's intermediate input methodology therefore must be rejected.

## B.  Adverse Facts Available

Mid Continent also contests Commerce's decision not to apply adverse facts available to Stanley's missing wiredrawing factors of production.  *See generally* Mid Continent Brief at 12-19; Mid Continent Reply Brief at 4-7.  Mid Continent argues that Stanley improperly withheld factors of production data.  *See* Mid Continent Brief at 12, 14-18; Mid Continent Reply Brief at 4-7.  Mid Continent further contends that Commerce's decision not to apply adverse facts available here was inconsistent with its decisions in other administrative proceedings.  *See* Mid Continent Brief at 18-19.  In addition, Mid Continent asserts that Commerce's choice of data to replace the missing wiredrawing factors of production was not based on substantial evidence.  *See* Mid Continent Brief at 12-14; Mid Continent Reply Brief at 6.  However, for reasons discussed below, Mid Continent's arguments are without merit.

When an interested party or any other person withholds information requested by Commerce, fails to provide requested information by the relevant deadline or in the manner and form requested, significantly impedes a proceeding, or provides information that cannot be verified, or when necessary information is for some other reason not available on the record of a proceeding, Commerce is authorized to fill in the information gaps using "facts otherwise available" (*i.e.*, facts that substitute for missing information).  19 U.S.C. § 1677e(a).  Commerce may rely on neutral (*i.e.*, non-adverse) "facts otherwise available" to fill these gaps, or, if Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for

information," Commerce may rely on "adverse facts available" (*i.e.*, facts that are adverse to the interests of that party).  19 U.S.C. § 1677e(b).

In its Issues and Decision Memorandum here, Commerce explained its rationale for not applying adverse facts available.   According to Commerce, because Stanley complied with Commerce's requests for information to the best of its ability during the course of the review and was able to provide factors of production data from unaffiliated wiredrawing subcontractors accounting for a substantial majority of drawn wire consumed during the period of review, Commerce had no reason to apply adverse facts available in this case.  *See* Issues & Decision Memorandum at 33 & n.90 (comment 17); *see also* Stanley Response Brief at 6-7.

Mid Continent asserts that, contrary to Commerce's finding, Stanley did not act to the best of its ability to cooperate with Commerce, and withheld factors of production data for at least one of its unaffiliated wiredrawing subcontractors. *See* Mid Continent Brief at 12, 14-18; Mid Continent Reply Brief at 4-7.[17]   However, record evidence supports Commerce's determination.   From the beginning of Commerce's individual investigation of Stanley, Stanley was forthcoming with Commerce about the factors of production data that it possessed for the subcontractor in question and the reason why it was not submitting that data.  For instance, in response to a questionnaire from Commerce, Stanley reported that    despite multiple attempts    it had been unable to obtain information that would allow it to verify the factors of production data that it possessed for the

---

[17]Specifically, Mid Continent contends that Stanley "withheld requested [factors of production] information in its possession for at least [[                    ]] of its wire drawers."  Mid Continent Amended Conf. Brief at 13.

subcontractor.   Supplemental Questionnaire for Section D at 12-13 (Conf. Doc. No. 109).[18]

Similarly, Stanley explained that it would have essentially been impossible to obtain the requested

information from another of its subcontractors. *Id*.[19]  In light of Stanley's forthcoming response to

Commerce's only questionnaire requesting factors of production data on Stanley's wiredrawing

subcontractors, and in light of Stanley's multiple attempts to obtain verifiable data, it cannot be said

that Commerce erred in concluding that Stanley cooperated with the agency and acted to the best of

its ability.[20]

---

[18]As Stanley explained to Commerce:

> Stanley and its representatives have expended much effort and made repeated visits
> to the [[  ]] remaining sub-contractors that provided wire drawing services for which
> the Department requested [factors of production] data . . . .  Despite the fact that
> wiredrawing is not [[[     ]]]'s principal business, Stanley's representatives were
> able to obtain all of [[  ]]'s wiredrawing [factors of production] data and most of the
> necessary accounting records for [[  ]].  However, despite repeated requests from
> Stanley's representative and three on-site meetings, company officials have
> repeatedly refused to provide the company's financial statements or certain additional
> accounting records that are necessary to confirming their data.

Supplemental Questionnaire for Section D at 12-13.

[19]As Stanley explained to Commerce:

> The remaining wiredrawing sub-contractor, [[     ]] first refused to provide any
> production and cost data.  Following repeated inquiries and three on-site meetings,
> [[     ]] demonstrated to Stanley's representatives that it exists as an informal
> business entity that operated under a business license borrowed from another
> company and that it did not have actual, separable accounting records.

Supplemental Questionnaire for Section D at 13.

[20]Mid Continent suggests that, in determining whether to apply adverse facts available,
Commerce is required to evaluate "whether [the] respondent has put forth its maximum effort to
provide [Commerce] with full and complete answers to all inquiries in an investigation."  Mid

Mid Continent fares no better on its claim that Commerce should have applied adverse facts available here based on Commerce's determination in a previous administrative proceeding Activated Carbon from the PRC.  Mid Continent Brief at 18; *see also* Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the People's Republic of China, 2007 WL 765248 at Comment 20 (Feb. 23, 2007) ("Activated Carbon Decision Memorandum").  For the same two reasons noted by Commerce in its Issues and Decision Memorandum in this proceeding, Activated Carbon from the PRC is distinguishable from the instant case, and Mid Continent's argument is unavailing.  *See* Issues & Decision Memorandum at 34 (comment 17).

As Commerce explained here, "the extent by which the respondents failed to provide [factors of production] data [in Activated Carbon from the PRC] was much more significant than Stanley's inability to obtain [factors of production data] from certain wiredrawing subcontractors."  Issues & Decision Memorandum at 34 (comment 17).  In Activated Carbon from the PRC, a respondent failed to report factors of production data from two direct and three indirect suppliers, and Commerce applied partial adverse inferences for the missing data.  Activated Carbon Decision Memorandum, 2007 WL 765248 at Comment 20.  The situation here involves fewer subcontractors.  *Id*.[21]  In addition, the respondent in Activated Carbon from the PRC failed to provide factors of production

---

Continent Brief at 15 (*quoting* Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).  But, although Stanley did not submit certain unverifiable data to Commerce, nothing on the record indicates that Stanley did not put forth its maximum effort to provide Commerce with the data it requested.

[21]Stanley did not provide data for [[   ]] of its subcontractors.  *See* nn.18-19, *supra.*

data for the producers of the subject merchandise itself, while, in this case, Stanley did not provide factors of production data for part of its production process that is subcontracted out to unaffiliated parties.  Issues & Decision Memorandum at 34.  In other words, Commerce here determined that it is more problematic when factors of production data are missing for the entire product (as in Activated Carbon from the PRC) than when factors of production data are missing for part of the production process (as in the instant case).  *Compare* Activated Carbon Decision Memorandum, 2007 WL 765248 at Comment 20 *with* Issues & Decision Memorandum at 34.  Based on these considerations, Commerce reasonably concluded that the result in Activated Carbon from the PRC is not controlling here.

Mid Continent's reliance on two other administrative determinations is similarly misplaced. *See* Mid Continent Brief at 18 (*citing* Issues and Decision Memorandum for the Administrative Review of Certain Cased Pencils from the People's Republic of China; Final Results, 2002 WL 1732817 at Comment 10 (July 25, 2002) ("Cased Pencils Decision Memorandum"); Notice of Final Determination of Sales at Less Than Fair Value: Creatine Monohydrate From the People's Republic of China, 64 Fed. Reg. 71,104, 71,109 (Dec. 20, 1999) ("Creatine Monohydrate Final Determination")).  In Cased Pencils from the PRC and Creatine Monohydrate from the PRC   as in Activated Carbon from the PRC   the non-cooperating suppliers were producers of the subject merchandise itself, not producers of components of the subject merchandise.  Further, in Creatine Monohydrate from the PRC, there was no indication that the respondents had even tried to obtain data from their suppliers.  *See* Creatine Monohydrate Final Determination, 64 Fed. Reg. at 71,108-09.  In this case, the two suppliers at issue were producers of components (wiredrawing services) of

the subject merchandise, and Stanley made a concerted effort to obtain verifiable factors of production data from them.  Thus, neither of the cases supports Mid Continent's claim.

As Commerce noted in its Issues and Decision Memorandum, the agency's analysis here "closely mirrors" that in its previous determination in yet another administrative review, Tapered Roller Bearings from the PRC.  *See* Issues & Decision Memorandum at 33-34 (comment 17); Issues and Decision Memorandum for the Final Results of Antidumping Review on Tapered Roller Bearings from the People's Republic of China, 2009 WL 170611 at Comment 4 (Jan. 13, 2009) ("Tapered Roller Bearings Decision Memorandum").  Tapered Roller Bearings from the PRC is analogous to the instant case because the respondent in that case, as in this one, was forthcoming about its inability to obtain factors of production data from subcontractors, and Commerce found that the respondent did not impede the proceeding.  *Compare* Issues & Decision Memorandum at 33-34 *with* Tapered Roller Bearings Decision Memorandum, 2009 WL 170611 at Comment 4.  Moreover, Tapered Roller Bearings from the PRC is also analogous to the instant case because, in both cases, "the missing [factors of production] were not for complete production of a product, but rather for a stage in the production process that is subcontracted out to unaffiliated parties."  Issues & Decision Memorandum at 34; Tapered Roller Bearings Decision Memorandum, 2009 WL 170611 at Comment 4.

Mid Continent's claim that Commerce's choice of data to replace the missing wiredrawing factors of production data was not based on substantial evidence is also unavailing.  Mid Continent Brief at 12-13.  Mid Continent faults Commerce for the assumption that the subcontractors whose data were missing from the record had production operations identical or comparable to the three

subcontractors whose data were on the record.   *Id.* at 13.   According to Mid Continent, the subcontractors whose data were on the record had "significantly different" production experiences, resulting in "significantly different production efficiencies among them."   *Id.*   Specifically, Mid Continent contends that these subcontractors had meaningful differences in their drawn wire yield rates (*i.e.*, the quantity of wire produced from a given quantity of rod) and in their consumption of various inputs.   *Id.*   Based on these considerations, Mid Continent concludes that Commerce unreasonably assumed that the data on the record for Stanley's wiredrawing subcontractors were appropriate to replace the missing data.   *Id.* at 14.

However, since Commerce had already decided not to apply adverse facts available to substitute for the missing data, Commerce was simply looking for neutral data to fill the information gap.   The weighted average of the three subcontractors' data on the record constituted a reasonable substitute for the missing data because they were reflective of the majority of Stanley's wiredrawing services data, which was already on the record.

In short, Commerce reasonably declined to apply adverse facts available because Stanley had cooperated with Commerce.   Mid Continent's arguments to the contrary notwithstanding, Commerce's determination in this case was consistent with Commerce's decisions in other administrative reviews.   And Commerce's selection of neutral facts available to account for the missing data was not unreasonable and was well within the agency's ample discretion.

## C. Surrogate Financial Ratios

In its Final Results, Commerce concluded that it could no longer use Lakshmi's financial

statement as a source for surrogate financial ratios in the underlying review, because the agency had identified evidence of countervailable subsidies in Lakshmi's statement.  *See* Issues & Decision Memorandum at 10-11 (comment 3).   After reviewing the other potential sources on the record, Commerce ultimately settled on the financial statements of three small Indian companies    J&K, Bansidhar, and Nasco.  *See* Issues & Decision Memorandum at 9-13.

Mid Continent takes strong exception to Commerce's decision to rely on the financial statements of J&K, Bansidhar, and Nasco, and objects to the agency's rejection of the financial statements of Sundram and Lakshmi.  *See generally* Mid Continent Brief at 2, 6-7, 19-27; Mid Continent Reply Brief at 7-9.  *But see* Def.'s Response Brief at 9, 18-23; Stanley Response Brief at 15, 30-38.  In any event, the Government now has requested a voluntary remand to allow Commerce to reconsider its position on the selection of financial statements, in light of recent intervening developments.  *See generally* Def.'s Remand Motion.  As discussed below, that request has merit and must be granted.

When constructing normal value for a foreign producer in a NME country, Commerce bases its determination on "the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1).  However, as discussed above, valuing the factors of production does not capture certain items, such as manufacturing overhead, selling, general and administrative expenses ("SG&A"), and profit.  Commerce calculates those surrogate values using ratios derived from the financial statements of one or more companies that produce identical    or at least comparable merchandise in the surrogate market economy country.  *See generally* 19 C.F.R. § 351.408(c)(4); 19 U.S.C. § 1677b(c)(1).

In the Final Results, Commerce explained its reasons for rejecting Sundram as a source for surrogate financial ratios:

> [H]aving an integrated wiredrawing process with [steel wire rod, or "SWR"] is key to reflect the production processes of [Stanley]. However, the record does not permit a conclusion that Sundram's production process mirrors Stanley Langfang's. First, nowhere in its financial statement does it indicate that Sundram consumes SWR. Its raw material consumption report lists only "steel" as an input. Thus, even though Sundram produces some comparable merchandise, [Commerce] cannot be certain that it uses the same primary raw material as Stanley Langfang, and thus cannot conclude Sundram's production process reflects that of [Stanley].

Issues & Decision Memorandum at 11 (comment 3). The Issues and Decision Memorandum further explains that Commerce rejected Sundram not only because, according to Commerce, Sundram "only produced comparable rather than identical merchandise," but, in addition, because Sundram "also produced and sold a large array of products not comparable to subject merchandise." *Id*. at 12.

The Final Results outlined as well Commerce's reasons for selecting the financial statements of J&K, Bansidhar, and Nasco as sources for surrogate financial ratios:

> Since the Preliminary Results, additional financial statements have been placed on the record, including those of Nasco, Bansidhar, and J&K. All three companies meet [Commerce's] surrogate value ("SV") selection criteria, and all three produce nails from SWR [steel wire rod]. In the case of Nasco, it also appears to produce nails either from drawn wire and/or hot-rolled sheet, but nonetheless consumed SWR during the fiscal year. . . . Second, of the remaining potential surrogate companies, only Nasco, Bansidhar, and J&K produce nails and use SWR in the production process.

Issues & Decision Memorandum at 11-12 (comment 3). Commerce further noted that "Nasco, Bansidhar, and J&K have invested in equipment required to produce nails and use SWR similar to [Stanley], whereas the other potential surrogate companies [have] not." *Id*. at 12. Reasoning that the financial ratios of companies that produce nails "are more appropriate to use than those of

companies that do not produce nails" (apparently referring, perhaps mistakenly, to Sundram), Commerce concluded that it would use the financial statements of Nasco, Bansidhar, and J&K to calculate surrogate financial ratios for the Final Results.  *Id.* at 12-13.

Noting that, in selecting sources of financial ratios, Commerce's general practice is to attempt to match the production experience of a surrogate company to the production experience of a respondent, Mid Continent argues that Commerce erred in using the financial statements of Bansidhar, J&K, and Nasco, because    Mid Continent asserts   their production and operational experiences were "fundamentally incomparable" to those of Stanley.  Mid Continent Brief at 19-20; *see also id.* at 21-26; Mid Continent Reply Brief at 7-9.  Mid Continent characterizes Bansidhar, J&K, and Nasco as "very small scale, private enterprises," while Stanley is a "large, diversified multi-national corporation."  Mid Continent Brief at 21-22; *see generally id.* at 2, 6-7, 19-27; Mid Continent Reply Brief at 7-9.

Mid Continent points to the financial statements of Bansidhar, J&K, and Nasco as proof that "their business activities and financial performance have fundamentally little to do with the production of steel nails or comparable [merchandise]."  Mid Continent Brief at 22; *see generally id.* at 22-24.[22]  Mid Continent also criticizes Commerce as ignoring a laundry list of concerns that, Mid Continent contends, "undermin[e] the use of the Nasco, Bansidhar, and J&K financial

---

[22]*See also* Mid Continent Brief at 22 (arguing that Bansidhar's sales revenues are largely attributable to resales of traded goods, "leaving virtually nothing to account for 'nail' production and sales");  *id.* at 22-23 (asserting that J&K is "primarily a wire drawer," and that J&K's sales for all produced goods are but a fraction of Stanley's sales of subject goods during the period of review); *id.* at 23 (arguing that Nasco "primarily produces hinges, washers, and 'tawa,'" and that only a small fraction of Nasco's sales revenue was attributable to sales of nails); *id.* at 23-24 (contrasting the fixed assets of the three much smaller companies with those of Stanley and Lakshmi).

statements" in the Final Results.  *Id*. at 24-26; *see also* Mid Continent Reply Brief at 8.[23]

Moreover, just as Mid Continent contends that the profiles of Bansidhar, J&K, and Nasco rendered them inappropriate as sources for surrogate financial ratios, Mid Continent argues that Lakshmi and Sundram are "large, multinational fastener producers like Stanley," with similar production experiences.  *See* Mid Continent Brief at 26; *see also* Mid Continent Reply Brief at 8-9. Mid Continent asserts, *inter alia*, that the sales revenues and fixed assets of Stanley, Sundram, and Lakshmi confirm that Sundram and Lakshmi "operate at comparable scales of production, and use comparable processes, and thus are more representative of Stanley's production experience" than are Bansidhar, J&K, and Nasco, on which Commerce relied in the Final Results.  *See* Mid Continent Brief at 26; *see also* Mid Continent Reply Brief at 8-9.  Mid Continent therefore requests that Commerce be directed "to reject the use of Nasco's, Bansidhar's, and J&K's financial statements

--------

[23]*See*, *e.g.*, Mid Continent Brief at 24-25 (concluding that Nasco's financial statements confirm "only minimal nail production," and suggesting that its nail production may be limited to nails for company's own internal consumption; asserting that Nasco is primarily a producer of products manufactured from hot-rolled steel, and that wire rod    the main input for steel nails accounted for only a very small percentage of Nasco's consumption of raw materials; arguing that production process for producing goods from hot-rolled steel is "entirely different, uses wholly different equipment, and has a significantly different cost structure" than companies such as Stanley that use wire rod as a main input); *id*. at 25 (stating that Bansidhar's financial statements indicate that company's financial results "are driven by significant *trading*, as opposed to *production* activity"; arguing that Bansidhar's manufacturing operations are operating at a loss, and that company showed profit only due to traded goods; asserting that Bansidhar's fiscal year production of *all nails* (in general) represents but a tiny fraction of Stanley's sales of *subject nails*); *id*. at 25-26 (highlighting fact that less than 5% of J&K's production was devoted to "wire nails," and valuation of those nails was not significant; asserting that J&K's main focus was on drawing wire rod into steel wire, and that most of company's sales were related to sales of steel wire; asserting that J&K's financial statements reflect receipt of subsidies in amount greater than company's "profit," and that   had J&K been recognized as operating at a loss    company would not have been considered an appropriate source of surrogate values; emphasizing that J&K was operating at less than 30% capacity during period of review).

as surrogate financial ratios and [to] apply the more appropriate financial ratios from Lakshmi and/or Sundram." *See* Mid Continent Brief at 26-27.

The Government and Stanley maintain that the financial statements of Bansidhar, J&K, and Nasco constitute the best available information for surrogate financial ratios and that their use by Commerce should be upheld as supported by substantial evidence and otherwise in accordance with law. *See generally* Def.'s Brief at 9, 18-23; Stanley Response Brief at 15, 30-38.

The Government seeks to deflect Mid Continent's emphasis on the magnitude of the differences in the scale of the production and operations of Stanley on the one hand and Bansidhar, J&K, and Nasco on the other. Specifically, the Government notes that, in the Final Results, Commerce cited several administrative decisions for the proposition that, in essence, "size doesn't matter" (at least not necessarily) in surrogate selection. *See* Def.'s Brief at 21-22 (*citing* Issues & Decision Memorandum at 11-13 (comment 3), and authorities cited there).[24]

In addition, the Government and Stanley particularly highlight Commerce's focus on the production of "identical" or "comparable" merchandise and the importance of the similarity of processes in the use of steel wire rod in the production of nails. *See generally* Def.'s Brief at 9, 18, 20-22; Stanley Response Brief at 32, 34-38. Notably, however, Commerce's conclusion that Sundram's production processes may not mirror those of Stanley and its determination that Sundram does not consume steel wire rod appear to be predicated solely on Sundram's financial statement. *See* Issues & Decision Memorandum at 11 (comment 3) (concluding that "the record does not permit

---

[24]*But see* Mid Continent Reply Brief at 8 (arguing that "[d]espite the fact that Commerce has in the past indicated that size not render a company unfit as a surrogate, in light of the stark differences in operations between the three surrogate [companies] selected and Stanley, the financial statements chosen by Commerce cannot reasonably be considered the best available information").

a conclusion that Sundram's production process mirrors [that of] Stanley," because, *inter alia*, "nowhere in its financial statement does it indicate that Sundram consumes [steel wire rod]"). Commerce has not directly addressed Mid Continent's specific arguments on this point; nor does it appear that Commerce has carefully considered all relevant evidence on the record. *See, e.g.*, Mid Continent Case Brief at 43, 46 (explaining, *inter alia*, that both nails and screws/fasteners are produced from steel wire and steel wire rod, and that "the production processes for nails and screws/bolts is extremely similar, involving the same input material, which undergoes the same production process"; very favorably comparing "the production process, product range, and physical characteristics of Sundram's screws and bolts and Stanley's nails").

In any event, after briefing the issue on the merits, the Government filed a motion requesting a voluntary remand of this matter to permit Commerce to reconsider its determination in the Final Results. *See generally* Def.'s Remand Motion.  In its motion, the Government explains that, since issuing the Final Results in this first administrative review, Commerce now has issued its Final Results in the second administrative review, where Commerce examined whether Bansidhar was a producer of merchandise identical or comparable to that produced by Stanley. *See* Def.'s Remand Motion at 2; *see also* Decision Memorandum for Second Nails Review, 2012 WL 699520 at Comment 2.  In the second administrative review, Commerce "refined [its] practice with regard to how [it] determine[s] whether a company is a producer of 'identical' or 'comparable' merchandise." Decision Memorandum for Second Nails Review, 2012 WL 699520 at Comment 2.[25]  In light of this

---

[25]Specifically, Commerce determined that, "where . . . detailed evidence is available in the record of the proceeding, [Commerce] will analyze a surrogate company's product mix to make a determination of whether it is more reasonable to consider the company an 'identical' producer as a whole or more reasonable to consider the company a producer of comparable merchandise."

policy refinement, the Government requests a remand in order to permit Commerce to reconsider the selection of surrogate financial ratios in this first administrative review.  *See* Def.'s Remand Motion at 2-3.

Stanley opposes the Government's motion for a voluntary remand, dismissing the issue of whether a company is a producer of "identical" or "comparable" merchandise as a "minor element" of Commerce's antidumping analysis, and asserting that the motion does not establish a "substantial and legitimate" concern within the meaning of SKF.  *See* Stanley Response to Def.'s Remand Motion at 1-3 (*citing* SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (citation omitted)).[26]  Stanley argues that the Government's request is not made "for any purpose except a vague and open-ended 'evaluation of this issue,'" and observes that the Government's motion "does not state that such a determination would be of any substantive consequence."  Stanley Response to Def.'s Remand Motion at 3.  Ultimately, Stanley maintains that there is no basis to believe that, even if Bansidhar were to be reclassified as a producer of "comparable" rather than "identical" merchandise, that determination would have any impact on Stanley's dumping margin.  *See id.*

---

Decision Memorandum for Second Nails Review, 2012 WL 699520 at Comment 2 (emphasis added); *see also* Def.'s Remand Motion at 2.

[26]Initially Stanley also opposed the Government's remand motion on the grounds that it would waste the resources of the court.  In particular, Stanley argued that, if the Government's remand were granted and the Court of Appeals rendered a decision on zeroing favoring Stanley's zeroing claim in this action, the issue of surrogate financial ratios would be moot because the zeroing ruling would reduce Stanley's dumping margin to zero without regard to Commerce's calculation of financial ratios.  Stanley Response to Def.'s Remand Motion at 3-4.  However, Stanley's argument has been overtaken by events.  As a result of the Court of Appeals' recent decision in Union Steel, Stanley has voluntarily dismissed its zeroing claim in this action.  *See* [Stanley Plaintiffs] Motion for Voluntary Dismissal of Their First Cause of Action; Union Steel v. United States, 713 F.3d 1101 (Fed. Cir. 2013).

Mid Continent, on the other hand, supports the Government's motion and argues that the Government's concerns are both substantial and legitimate. *See* Mid Continent Response to Def.'s Remand Motion at 3-4. According to Mid Continent, "Commerce's recent refinement to its practice potentially will result in a change to the financial statements selected and the financial ratios calculated, thereby altering . . . [the] final [dumping] margin." *See id*. at 3. Mid Continent further notes that there is no "evidence that [the Government's] request for partial remand is motivated by bad faith or is frivolous in nature." *Id*. at 3-4 (*citing* Clemmons v. West, 206 F.3d 1401, 1403-04 (Fed. Cir. 2000) (citation omitted)).

As Stanley suggests, it may be that Commerce's policy refinement will have no impact on the ultimate dumping margin in this case. But, at this point, no one can be certain. In this review, Commerce has considered the issue of whether a company produced "identical" or "comparable" merchandise to be a relevant factor in its selection of surrogate companies for financial ratios. For instance, Commerce rejected Sundram in part because it was a producer of "comparable," not "identical," merchandise. Issues & Decision Memorandum at 12 (comment 3) (explaining that Commerce found Sundram to "only produce[] comparable rather than identical merchandise"). Similarly, in the Preliminary Results, Commerce noted that it had selected Lakshmi, even though the company "produce[d] comparable rather than identical merchandise." Surrogate Valuation Memorandum for the Preliminary Results at 15-16.

Thus, a change in the way the agency determines whether merchandise is "identical" or "comparable" conceivably could have implications for Commerce's ultimate determination in the underlying administrative review here. The Government's concern is clearly "substantial and

legitimate." *See* SKF, 254 F.3d at 1028 (explaining that a "remand is generally required if the intervening event *may* affect the validity of the agency action" (emphasis added)).   A remand is therefore appropriate, to permit Commerce to reevaluate its determination in the Final Results concerning the selection of financial statements as sources for surrogate financial ratios, in light of the agency's recent policy refinement.   On remand, Commerce shall consider anew all record evidence in light of, *inter alia*, the agency's updated policy and shall fully articulate the rationale for its determination on remand, and identify all relevant evidentiary support, whatever that determination may be.

### D. Surrogate Values for Electricity

Mid Continent challenges Commerce's determination in the Final Results to value the electricity consumed in producing nails based on data published by India's Central Electricity Authority ("CEA") in March 2008, rather than on data that the CEA published in March 2009 (which Mid Continent placed on the record here).   *See generally* Mid Continent Brief at 2, 7, 27-28; Mid Continent Reply Brief at 9-11.   *But see* Def.'s Brief at 9-10, 23-25; Stanley Response Brief at 16, 38-39.   Mid Continent emphasizes that Commerce's decision not to use the 2009 data was based on the agency's conclusion that the 2008 data are "more contemporaneous" than the data published in 2009.   *See* Issues & Decision Memorandum at 15 (comment 5).

Mid Continent contends that Commerce's determination concerning the relative contemporaneity of the two data sets is demonstrably "factually incorrect," and that the Final Results on this point therefore are not supported by substantial evidence.   *See* Mid Continent Brief at 27-28; Mid Continent Reply Brief at 9-11.   Remand is necessary to allow Commerce to reconsider this issue

and to clarify both its determination and the underlying rationale.

In selecting surrogate values, Commerce seeks the "best available information" in accordance with 19 U.S.C. § 1677b(c)(1).  Def.'s Brief at 23.  In evaluating potential sources, Commerce prefers "investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data."   Policy Bulletin 04.1; *see also* Issues & Decision Memorandum at 13 (comment 4); Def.'s Brief at 23 (similar).  Here, Commerce found that the two potential data sources for surrogate values for electricity   *i.e.*, the 2008 data and 2009 data  both satisfied the relevant criteria, but that the 2008 data were "more contemporaneous" with the period of review.   *See* Issues & Decision Memorandum at 15 (comment 5).   In its entirety, Commerce's analysis of the matter in the Issues and Decision Memorandum constitutes but a few brief sentences, with no elaboration:

> We have followed the [surrogate value] selection [criteria] . . . [*i.e.*, public availability, contemporaneity, representativeness, and specificity, as well as whether the data are from an approved surrogate country and are exclusive of taxes and duties].  In the case of electricity, after reviewing both the 2008 and 2009 CEA data, we have determined that both values are publicly available, from an approved surrogate country, specific to the input in question, and . . . broad-market averages. *With respect to contemporaneity*, . . . *the rates contained in the 2008 CEA data cover more of the* [*period of review*] *than do those of the 2009 data*, *and are thus more contemporaneous*.  Therefore, for the final results of this review, we have continued to value electricity using CEA data from 2008 because they best satisfy [Commerce's] [surrogate value] selection criteria.

Issues & Decision Memorandum at 15 (comment 5) (emphasis added).

The bases for Commerce's conclusion that the 2008 data are "more contemporaneous" than the 2009 data   quoted above   are entirely unclear.  The 2008 data reflect effective tariff rates only

through March 31, 2008, and the most recent data point for electricity pricing in the 2008 data is from May 2007. *See* Mid Continent Brief at 27; Mid Continent Reply Brief at 10; *see also* Mid Continent Case Brief at 53-54 (*citing* Surrogate Valuation Memorandum for the Preliminary Results at Exh. 46 (data table showing May 2007 as most recent effective date for tariff rates in 2008 data)). In contrast, the 2009 data reflect effective tariff rates through March 31, 2009, and the most recent data point for electricity pricing in the 2009 data is from August 2008. *See* Mid Continent Brief at 28-29; Mid Continent Reply Brief at 10; *see also* Mid Continent Case Brief at Att. 3 (data table showing August 2008 as most recent effective date for tariff rates in 2009 data). Although the 2009 data include many of the same data points as the 2008 data for pre-2008 tariff rates, the 2009 data also include updated energy pricing from 2008 for Madhya Pradesh, Maharashtra, Mumbai (B.E.S.T.), Mumbai (Reliance Energy), and Mumbai (TATA). *Compare* Surrogate Valuation Memorandum for the Preliminary Results at Exh. 46 (2008 data) *with* Mid Continent Case Brief at Att. 3 (2009 data). Thus, on the whole, the 2009 data appear to be more contemporaneous.

The Government attempts to defend Commerce's action in the Final Results by underscoring that the 2008 data "comprise over thirty pages of detailed 'price data for small, medium, and large industries' across an extensive range of geographical locations, whereas the 2009 data appear in summary form on a single page containing only a handful of data points." *See* Def.'s Brief at 24 (*citing* Surrogate Valuation Memorandum for the Preliminary Results at 11). The Government's observation may well have some bearing on the relative merits of the two data sets. However, it says nothing at all about the relative "contemporaneity" of the data, which was the basis for Commerce's selection of the 2008 data over the 2009 data in the Final Results. An agency determination cannot

be sustained on the strength of a *post hoc* rationale supplied by litigation counsel.  *See* Burlington

Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).  As the Supreme Court has explained,

"an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Motor

Vehicle Mfg. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983).

        The 2008 data may be superior in other respects yet to be detailed by Commerce.  But the

2009 data appear to be more contemporaneous with the period of review at issue (January 23, 2008

to July 31, 2009).  The plain meaning of "prices that are contemporaneous with the . . . period of

review" in this context is prices that are reflective of those actually in effect during the review

period.  Thus, a data set reflecting prices that were in effect for more months of the review period

is more contemporaneous with the period of review than a data set reflecting prices that were in

effect for fewer months of the review period.  Based on this understanding, the 2009 data reflect

tariff rates in effect for 13 of the 18 months of the period of review (*i.e.*, late January 2008 through

late March 2009), while the 2008 data cover less than two months of the period of review (*i.e.*, late

January 2008 through late March 2008).  *See* Mid Continent Brief at 27.[27]

        The Government argues that "issuing a subsequent edition [of data on electricity rates] does

_____

        [27]There is much confusion as to the exact nature, meaning, and significance of the
information in the two sets of data.  For example, the Government asserts that "the 2008 data show
the date of implementation for each rate    not the specific dates on which the rate was in effect."
*See* Def.'s Brief at 25.  But other parties differ.  Similarly, Stanley insists that the 2008 data reflect
electricity rates that were "in effect for thirteen months of the [period of review]," and that the 2009
data reflect rates that were "only in effect for four months" of that period.  *See* Stanley Response
Brief at 38-39.  And, as discussed above, Mid Continent's figures are quite different.  *Compare* Mid
Continent Brief at 27-28 (arguing that 2009 data reflect rates in effect for 13 of the 18 months of the
period of review, while 2008 data cover less than two months of the period).  It appears that there
is even disagreement and confusion as to the definition of "contemporaneous."  *See generally*
Transcript of Oral Argument at 24-27, 35-47, 59-63 (oral argument on surrogate value for
electricity).  Commerce must clarify and then explain all such matters on remand.

not affect the individual rates [in the prior publication] nor does it mean the rates in the prior publication are no longer effective." Def.'s Brief at 25.   However, the Government's next statement that the subsequent edition "simply reports any new rates that came into effect after the earlier publication"   does not support the Government's assertions that the 2008 data are more contemporaneous than the 2009 data. *See id*.   Instead, that statement suggests that the 2009 data are more contemporaneous, because the "new rates that came into effect after the earlier publication" should make the 2009 data more aligned with the period of review.

In light of the discussion above, remand is warranted to permit Commerce to reconsider this issue, and to clarify its determination that the 2008 data are more contemporaneous than the 2009 data and to detail the bases therefor.   If, upon review, Commerce concludes that the 2008 data are not more contemporaneous, Commerce shall determine which data constitute the "best available information"   based on all relevant factors   and shall explain why.

### E.   Ministerial Error Allegation

Stanley's sole remaining issue in this consolidated action is its "ministerial error" claim.   The gravamen of this claim is that Commerce declined to correct "an error in [the agency's] computer program," which   according to Stanley   therefore did not, as a general matter, properly calculate U.S. prices and normal value on the same weight basis.   *See generally* Stanley Brief at 2, 3, 4-5, 10, 25-30, 31; Stanley Reply Brief at 14-15.   *But see* Def.'s Brief at 10, 31-37; Mid Continent Response Brief at 3-4, 20-24.   According to Stanley, the effect of the error was to "overstate[] Stanley's normal values and increase[] the resulting dumping margin by about one percent *ad valorem*."   Stanley Brief at 26.

Specifically, Stanley contends that, due to a "missing instruction," Commerce's computer program did not "adjust normal values to account for the fact that Stanley's per-kilogram normal values were computed using the weight of nails alone while its U.S. selling prices were converted from per-carton prices to per-kilogram prices using the combined weights of nails plus collating materials." Stanley Brief at 2; *see also id.* at 3, 4-5, 25-26; Stanley Reply Brief at 14.[28] Commerce's failure to correct this "error" in "computer programming" was, Stanley asserts, "a ministerial error."

_____

[28]The alleged ministerial error was the product of a process which began when   in response to Commerce's questionnaire regarding the company's factors of production    Stanley reported the amounts of each factor used to produce one kilogram of nails. *See* Stanley's Response to Section C Questionnaire at 14 (Pub. Doc. No. 159). Using this data, Commerce "added the costs of all the factors, including the plastic, paper or wire collating material used to connect the nails, and obtained a price for the normal value of collated nails stated in terms of dollars per kilogram." Def.'s Brief at 32-33.

Thereafter, Commerce calculated the United States price using the gross unit price charged to the first unaffiliated customer in the United States as reported by Stanley. Def.'s Brief at 33. The gross unit price charged was for a carton of collated nails. *Id*. During further calculations, "[t]o restate the United States price of a carton of collated nails in terms of weight so that it could be compared to normal value (which was calculated in terms of weight), Commerce divided the price of each carton by the weight of its contents (thus restating the price in dollars per kilogram of collated nails)." *Id*.

Commerce then had to select a conversion factor. Def.'s Brief at 33. In its questionnaire response, Stanley provided four different options for conversion factors, including CONGWGT3U (or "C3," the weight of collated nails) and CONGWGT4U (or "C4," the weight of collated nails minus the weight of collating materials). *Id*. & n.5. According to Commerce, the agency decided to divide the price of each carton by the weight of collated nails, or C3, because "collating materials are part of the finished product." *Id*. at 34. Finally, Stanley's dumping margin was calculated by subtracting the United States price from the normal value.

In Stanley's view, the alleged ministerial error was thus "an error in [Commerce's] *computer program*" because it did not account for the fact that Commerce "converted Stanley's . . . U.S. selling prices to prices per kilogram using the combined weight of nails and collating materials contained in the carton," while, in the meantime, Commerce "calculated per-kilogram normal values based on the weight of nails alone." Stanley Brief at 25-26 (emphasis added).

Stanley Brief at 26, 30; *see also id.* at 2, 3, 5, 10, 25, 28, 29.

Stanley further argues that Commerce did not even address the ministerial error that Stanley *actually* alleged. Stanley Brief at 29-30; Stanley Reply Brief at 14; *see generally* Stanley's Request for Correction of Significant Ministerial Errors (Pub. Doc. No. 387). In other words, Stanley maintains, Commerce ended up "focus[ing] . . . on an issue that Stanley did not raise" which was, Stanley contends, "the selection of the cartons-to-kilograms conversion denominator itself." Stanley Brief at 29-30 (*citing* Amended Final Results, 76 Fed. Reg. at 23,280). But it was not Commerce's selection of the cartons-to-kilograms denominator that was the ministerial error, Stanley urges; rather, it was the "computer programming step that occurred *after*" Commerce selected the denominator. Stanley Brief at 30; Stanley Reply Brief at 14. Stanley concludes that, because Commerce focused on the wrong ministerial error allegation, Commerce's "denial of Stanley's correction request [was] therefore unreasonable." Stanley Brief at 29.

Whether Commerce focused on the incorrect ministerial error allegation, or whether Commerce's alleged error was in fact a ministerial error at all (a point that the Government and Mid Continent dispute) is of no moment here, because Stanley failed to exhaust its administrative remedies. *See* Def.'s Brief at 10 (arguing that Stanley is "characterizing," *post hoc*, a substantive issue "as a ministerial error"), 36, 37 (same); Mid Continent Brief at 3-4, 22, 24 (same). For the reasons discussed below, Stanley's claim must fail.

To promote "transparency," Commerce has a long-standing practice of disclosing to parties to an administrative review the details of the agency's antidumping calculations and affording them an opportunity to point out and request correction of any "ministerial errors" identified in the

calculations.  *See generally* 19 C.F.R. § 351.224 ("Disclosure of calculations and procedures for the correction of ministerial errors.").[29]

Pursuant to the regulations, when Commerce discloses its antidumping calculations to a party, the party has five days thereafter to file comments concerning any ministerial errors.  19 C.F.R. § 351.224(c)(2).  The party's comments are to "explain the alleged ministerial error" by pointing to evidence in the record, "and must present what, in the party's view, is the appropriate correction."  19 C.F.R. § 351.224(d).  These comments help Commerce correct   "if appropriate"  any ministerial errors and amend (if necessary) preliminary and/or final results, as well as publish any necessary corrections to the public.  19 C.F.R. § 351.224(e).

To similar ends, the Court of Appeals has instructed that interested parties "*must* point out any ministerial errors [concerning the preliminary results of a review] in their case briefs" filed with Commerce following the issuance of preliminary results.  QVD Food Co. v. United States, 658 F.3d 1318, 1328 (Fed. Cir. 2011) (*quoting* 19 C.F.R. § 351.224(c)(1); 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to [Commerce's] final determination or final results . . . .")) (emphasis added).  In other words, a party must exhaust its administrative remedies before pressing a ministerial error allegation in this forum.

Here, Stanley failed to exhaust its administrative remedies by not timely and properly objecting to Commerce's choice of conversion factors in the Preliminary Results.  *See* Def.'s Brief at 31-32, 35, 36-37.  Although Stanley was put on notice of Commerce's choice of conversion

---

[29]A ministerial error is defined by the regulations as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which [Commerce] considers ministerial."  19 C.F.R. § 351.224(f); *see also* 19 U.S.C. § 1675(h) (similar).

factors and programming code in the Preliminary Calculation Memorandum (referenced in the

Preliminary Results), Stanley raised no objection within the five-day period for doing so.  *See* Def.'s

Brief at 32, 34-35; Preliminary Results, 75 Fed. Reg. at 56,075-76; 19 C.F.R. § 351.224(c)(2)(i)-(ii)

(providing that party must file comments within "five days" of Commerce disclosing details of its

antidumping duty calculations).  Nor did Stanley include any comments concerning ministerial errors

in its administrative case brief, as the regulations specifically required it to do.  *See* 19 C.F.R. §

351.224(c)(1) (requiring party to include "comments concerning ministerial errors made in the

preliminary results of a review" in the party's administrative case brief).

        Stanley's failure to raise any ministerial allegations at the time Commerce's calculations were

disclosed, or even in its administrative case brief, is fatal to the claim that it seeks to press here.  As

the Court of Appeals has squarely held, "a ministerial error made by Commerce that was reflected

in its preliminary antidumping duty determination need not be corrected [by Commerce] when no

interested party pointed out the error in a timely manner."  QVD Food, 658 F.3d at 1328 (*citing*

Dorbest Ltd. v. United States, 604 F.3d 1363, 1376-77 (Fed. Cir. 2010)).  In Dorbest, the court

explained that parties are "procedurally required to raise the[ir] issue before Commerce at the time

Commerce [is] addressing the issue."  Dorbest, 604 F.3d at 1375 (*quoting* Mittal Steel Point Lisas

Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008)) (internal quotation marks omitted).  The

Dorbest court instructed that "[t]his is because '[s]imple fairness to those who are engaged in the

tasks of administration, and to litigants, requires as a general rule that courts should not topple over

administrative decisions unless the administrative body not only has erred but has erred against

objection made at the time appropriate under its practice.'"  Dorbest, 604 F.3d at 1375 (*quoting*

United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37 (1952)).

In the case at bar, Stanley failed to assert its ministerial error allegation "at the time Commerce was addressing the issue" both within the specified five-day period following disclosure, and in its administrative case brief.  Dorbest, 604 F.3d at 1375; Def.'s Brief at 32, 35, 36-37.  Stanley could  and should  have mounted its challenge within five days of Commerce disclosing its antidumping margin calculations at the time of the Preliminary Results, and pursued the matter in its administrative case brief as well.  See QVD Food, 658 F.3d at 1328; 19 C.F.R. § 351.224(c)(1)-(2).  Yet it was not until after publication of the Final Results that Stanley requested that Commerce correct the alleged ministerial error.  See Def.'s Brief at 36; see generally Stanley's Request for Correction of Ministerial Errors at 5-9 (Pub. Doc. No. 387) (dated March 23, 2011).  Thus, Stanley did not raise the challenge "until after the proceeding had essentially concluded."  Def.'s Brief at 36.

In the Preliminary Calculation Memorandum, Commerce specifically identified its selection of CONWGT3U (the conversion factor) as "the most appropriate conversion weight to use," stating that it "represents the weight of the finished nail plus any collating materials, reflecting the scope of the order and also the fact that collating materials are part of the finished product."  Preliminary Calculation Memorandum at 1-2.  In addition, Commerce provided "over two hundred pages of detailed calculations" supporting its decision to use what the agency believed to be the most appropriate conversion factor.  See Def.'s Brief at 35.  As such, "Commerce clearly gave Stanley ample opportunity to raise the issue after the Preliminary Results."  Def.'s Brief at 36.  Because it did not do so, Stanley failed to exhaust its administrative remedies and is thus barred from pursuing its claim of ministerial error in this forum.

## IV.  <u>Conclusion</u>

Stanley's Motion for Judgment on the Agency Record is denied, and Mid Continent's Motion for Judgment on the Agency Record is denied in part and granted in part.  Further, the Government's Motion for Partial Voluntary Remand is granted.  This matter is remanded to the Department of Commerce for further proceedings not inconsistent with this opinion.  A separate order will enter accordingly.

/s/ Delissa A. Ridgway
Delissa A. Ridgway
Judge

Dated:  September 3, 2013
     New York, New York